## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF SOUTH CAROLINA
## GREENVILLE DIVISION

| | |
|---|---|
| Jason Lyons, Chad Wright, and Adrian Russo, | Case No. 6:17-cv-02362-MGL |
| Plaintiffs, | |
| v. | **FIRST AMENDED COMPLAINT FOR DAMAGES, DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF** |
| BAIC, Inc., VFG, Inc, (f/k/a Voyager Financial Group), SoBell Ridge Corp., Bradling Financial Group, Veterans Benefit Leverage, Inc., Andrew Gamber, Mark Corbett, Candy Kern-Fuller, and Upstate Law Group, | |
| Defendants. | |

Plaintiffs Jason Lyons, Chad Wright, and Adrian Russo bring this action against Defendants Andrew Gamber, Mark Corbett, Candy Kern-Fuller, BAIC, Inc., VFG, Inc. (f/k/a Voyager Financial Group), SoBell Ridge Corp., Bradling Financial Group, Veterans Benefit Leverage, and Upstate Law Group and allege the following:

## I

## PRELIMINARY STATEMENT

1.      This lawsuit arises out of the concerted conduct of a group of individuals and their related companies who prey upon United States veterans to bilk them out of their federally-protected military pensions and benefits.  The victims of this scam are often wounded or injured

from their years of military service and are typically financially desperate at the time they are enticed by Defendants to borrow money as set forth below.

2.     Federal law unequivocally declares that any agreements purchasing military pensions or benefits are "prohibited . . . and void from inception." *See* 38 U.S.C. § 5301(a) (veteran benefits). *See also* 37 U.S.C. § 701 (prohibition on assignment of military retirement pay). The core purpose of these laws is to protect veterans' economic interests, ensure that they always have available to them their federal income stream, and to protect them from predatory lenders or other unfair business practices.

3.     Despite these prohibitions, the Defendants have devised, and are presently engaged in, a scheme that induces veterans to enter into costly, unconscionable agreements that directly violate these federal laws. The scheme includes contracts in which the veterans are charged undisclosed interest rates (far in excess of rates allowed by usury statutes) and in which the veterans sell their retirement or disability benefits for a period of months or years in exchange for a lump sum payment.

4.     It is the purpose of this lawsuit to obtain damages for three such victims of this scam and to obtain declaratory and injunctive relief in the form of precedents that will assist not only them but other veterans who have been or may in the future be injured by this scheme.

5.     Declaratory relief is critical to stopping this conduct. Efforts by state enforcement officials – including securities regulatory agencies in Texas, New Mexico, Pennsylvania, California, and elsewhere – to stop this illegal activity have met with only partial success. The State of Arkansas, for example, obtained a consent order in 2014 permanently barring Defendants Andrew Gamber and Voyager Financial Group from continuing their illicit pension-related sales activities in that state. The agency, however, swiftly re-opened its investigations

when it concluded that Mr. Gamber simply continued "to operate a similar enterprise under another company name," namely Strategic Marketing Innovators LLC, BAIC, Inc. and Andrew Paul Gamber." *See Pension Advances: Legitimate Loans or Shady Schemes?,* Testimony of Kaycee L. Wolf, Staff Attorney for the Arkansas Securities Department, Before the United States Senate Special Committee on Aging (September 30, 2015), p.2.    https://www.aging. senate.gov/imo/media/doc/Wolf_9_30_15.pdf    (last   accessed   6/20/2017)(hereinafter   "Wolf Testimony").  Texas likewise shut down Mr. Gamber's operations in that state in 2016.  In doing so, it noted Mr. Gamber's history of operating under multiple corporate guises, including entities named Voyager Financial Group, VFG, LLC and SoBell Corp.  Attached hereto as Exhibit A are copies of cease and desist orders entered against one or more of the Defendants by the States of Arkansas, New Mexico, Pennsylvania, Texas, California, Iowa, Mississippi and Florida.

6.     The impact of the Defendants' scam is significant.   For example, state investigators in Arkansas concluded that between February, 2011 and August 2012, Mr. Gamber and just one of his related entities (VFG) had illegally entered into contracts with veteran pensioners and beneficiaries valued at more than $34 million.  Wolf Testimony, p. 5.  Hundreds, perhaps thousands, of former servicemen and women have fallen prey to this scheme.  Veterans enticed into these schemes find that they are forced to borrow amounts that typically are in excess of $25,000, with correspondingly high imputed finance charges.  Defendant Corbett, for example, has boasted elsewhere that "he gets 30 to 50 calls a day from people who want cash for their  pensions."    *See*   http://www.aarp.org/money/credit-loans-debt/info-2014/beware-of-the-pension-predators.html (last accessed 6/20/2017).  There is every reason to believe the illicit conduct of the Defendants will continue unless this Court declares this scheme illegal.

## II.
## THE PARTIES

7.      Plaintiff Jason Lyons is a resident and citizen of the State of New Jersey.  Mr. Lyons is a veteran, having been honorably discharged from the Marines.  Mr. Lyons receives military disability benefits subject to 38 U.S.C. §5301.

8.      Plaintiff Chad Wright is a resident and citizen of the State of South Carolina. Mr. Wright is a veteran, having been honorably discharged from the Army.  Mr. Wright receives military disability benefits subject to 38 U.S.C. §5301.

9.      Plaintiff Adrian Russo is a resident and citizen of the State of Maryland.  Mr. Russo is a veteran, having been honorably discharged from the Army.  Mr. Russo receives military retirement pay subject to 37 U.S.C. § 701.

10.      Defendant Andrew Gamber is a resident and citizen of Arkansas and reportedly resides at 742 County Road 464, Jonesboro, Arkansas.  He also reportedly has maintained an office at 1000 Highland Colony Park, Suite 5203, Ridgeland, MS 39157, *i.e.*, the same address as Defendant SoBell.  *See* Paragraph 15, below.  That address is, in fact, actually a convenience address operated by Regus Offices.  On information and belief, Mr. Gamber is an investor in or effectively controls VFG, SoBell and BAIC and is a director or officer of each such entity.

11.      Defendant BAIC's address is not listed in any of the documents that were signed with BAIC by the Plaintiffs.  Nor is BAIC's state of incorporation, email address or even a phone number provided in any of those documents.  BAIC has stated in certain court filings through its counsel that it is located at BAIC, Inc., PO Box 2199, Gainesville, TX 76241-2199.  The State of Mississippi, however, reports in its recent cease and desist order against Gamber and his affiliated companies that BAIC maintains its principal place of business at 211 E. 7th

-4-

Street, Suite 620, Austin, Texas, 78701. *See* Exhibit A, p. 69. BAIC is a Texas corporation. Gamber is the President of BAIC.

12.     Defendant VFG, LLC is a Delaware Limited Liability Company, with its principal place of business located at 801 Technology Drive, Suite F, Little Rock, Arkansas 72223. Mr. Gamber is believed to be the managing member of VFG, owning 100% of the company as of February, 2013. On information and belief, VFG was formerly known as Voyager Financial Group, LLC.

13.     SoBell Corp. ("SoBell") is (or was) a Mississippi for-profit corporation, with its principal address being 1000 Highland Colony Park, Suite 5203, Ridgeland, Mississippi 39157. Gamber is the sole incorporator of SoBell.

14.     Defendant Mark Corbett is believed to be a resident of the State of Arkansas. He has, at various times, held himself out as operating a website (now closed) called www.buyyourpension.com. He has maintained multiple other websites, including http://www.vapensionloans.com, veteransbenefitsleverage.com, buyoutyourpension.com, and buyyourannuity.com. He has represented to various veterans that he operates as an independent contractor for BAIC. In furtherance of the Defendants' common enterprise, Corbett interviews interested veterans in order to qualify them for purposes of buying some or all of the veteran's benefits. Corbett has held himself out as the Director of Marketing of Bradling Financial Group. In an apparent effort to conceal his identity, Mr. Corbett has used a photograph (purporting to portray Mr. Corbett himself) on one or more of his websites; in fact, that photograph was lifted from an online article in Forbes Magazine. *Compare* https://vapensionloans.com/index.php/va-pension-advances *and* https://www.forbes.com/sites/jacquelynsmith/2013/03/11/10-nonverbal-cues-that-convey-confidence-at-work/#79de7b7a5e13 (last accessed June 210, 2017).



15.    Defendant Bradling Financial Group is a business entity, form unknown, that represents that it is located at 232 Market Street, Flowood, Mississippi 39232.  That address is, in fact, actually a convenience address operated by Regus Offices.  Among other websites, Bradling has promoted itself on:

| | |
|---|---|
| https://pensionloancompanies.com | www.LumpSumForPensions.com |
| www.LumpSum4Pensions.com | www.PensionAdvancer.com |
| www.VeteransBenefitLeverage.com | www.VBLfinancial.com |

*See* Exhibit B (last visited June 7, 2017).

16.    Defendant Veterans Benefit Leverage is a business entity, form unknown, which declares on an affiliated website that it operates in "partnership with Bradling," and states that it is located at 33215 Temecula Parkway, Temecula, CA 92592."  *See* Exhibit B, page 5.  It further describes itself as "a referral agency operated by Bradling Financial Group LLC and provides

information       about       services       available       to       veterans."       *See*
http://www.veteransbenefitleverage.com/contact-us.html (last visited June 20, 2017).

17.    Defendant Candy Kern-Fuller is a resident and citizen of the State of South
Carolina.   She is an attorney and a partner in Upstate Law Group, LLC.

18.    Defendant Upstate Law Group, LLC is a law firm located at 200 East Main Street,
Easley, SC 29640.   Upstate Law Group has maintained one or more IOLTA account(s) at
institutions such as SunTrust Bank, N.A. and Community 1st Bank through which the payments
to and from the Defendants flow in connection with the pension scam described below.  Kern-
Fuller and Upstate have acted as a key conduit in the scam through their law firm IOLTA
account, which effectively has acted as the central bank for the scheme.  In addition, Kern-Fuller
and Upstate (1) review and assist veterans in obtaining identity and financial verification
documents;  (2) receive authorization from veterans to make inquiries of the Veterans
Administration to confirm the veteran's income and other matters associated with the scheme;
(3)  facilitate the execution of the contracts; (4) provide "escrow" services for the persons who
buy  the  veterans'  loans;  (5)  sue  allegedly  defaulting  veterans  in  an  effort  to  enforce  the
agreements; and (6) oppose attempts to discharge such debt through bankruptcy.

19.    Upstate Law Group, Strategic Marketing Innovators, SoBell and perhaps other
Defendants  are  under  investigation  by  the  Securities  and  Exchange  Commission  for  their
activities  in  connection  with  the  pension  scheme  at  issue  in  this  lawsuit.   *See*
https://www.sec.gov/litigation/litreleases/2017/lr23763.htm  (last  visited  Jun.  8,  2017).   This
Court may also take judicial notice of the subpoena enforcement proceeding initiated by the
Securities and Exchange Commission. *See Securities and Exchange Commission v. Upstate Law
Group,  Strategic  Marketing  Innovators,  Inc.,  Performance  Arbitrage  Company,  Inc.,  and*

*Financial Products Distributors, LLC*, No. 4:17-mc-0009-A, United States District Court for the Northern District of Texas (Ft. Worth Division).

### III.
### JURISDICTION AND VENUE

20.     This Court has subject matter jurisdiction over this civil action pursuant to 28 U.S.C. § 1331 because this case presents federal questions arising under:  38 U.S.C. §5301(a) (prohibiting assignment of veteran benefits) and 37 U.S.C. § 701 (prohibiting assignment of military retirement), as well as the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962, 18 U.S.C. § 1341 (mail fraud) and 18 U.S.C. §1343 (wire fraud).

21.     Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because a substantial portion of the events, acts and omissions giving rise to the claims addressed in this Complaint occurred in this District.  Among other things, Defendant Kern-Fuller has maintained  in this District the IOLTA bank accounts through which funds have been funneled to facilitate these illegal transactions.  In addition, the agreements used by Defendants to effectuate their illegal schemes have specified that venue for any dispute raised by a veteran seeking to challenge the agreement shall be in Greenville County.

### IV.
### FACTS

22.     All Defendants have used instrumentalities of interstate commerce, including but not limited to the U.S. Postal Service, private delivery services, interstate wires, federally chartered national banking associations, federally insured banks and financial institutions, interstate highways, and common carriers to transmit information in furtherance of their scheme as described below and to transfer the money scammed from veterans among themselves and to third parties in interstate commerce and across state lines.  Without limitation, one such bank

account used by the Defendants in interstate commerce is the IOLTA account (or accounts) maintained by Defendants Kern-Fuller and Upstate Law Group.

> ### A.    The Operation of the Federal Anti-Assignment Acts

23.    Almost since the inception of the United States, the nation has provided some form of disability payment in order to assist those persons who have been disabled in the line of military duty so they may live a whole and productive life.  Likewise, the country has long provided pensions to persons who serve the requisite term of military duty.  For over 100 years, federal law has prohibited any attachment, levy, seizure or assignment of those benefits and pensions.

24.    The current iteration of federal law as reflected in 38 U.S.C. § 5301(a) renders void any purported sale or assignment of military benefits for consideration.  It states:

> **(1) Payments of benefits due or to become due under any law administered by the Secretary shall not be assignable except to the extent specifically authorized by law**, and such payments made to, or on account of, a beneficiary shall be exempt from taxation, shall be exempt from the claim of creditors, and shall not be liable to attachment, levy, or seizure by or under any legal or equitable process whatever, either before or after receipt by the beneficiary. […]
>
> **(3)**
>> **(A)**  This paragraph is intended to clarify that, in any case where a beneficiary entitled to compensation, pension, or dependency and indemnity compensation enters into an agreement with another person under which agreement such other person acquires for consideration the right to receive such benefit by payment of such compensation, pension, or dependency and indemnity compensation, as the case may be, except as provided in subparagraph (B), and including deposit into a joint account from which such other person may make withdrawals, or otherwise, such agreement shall be deemed to be an assignment and is prohibited.. . .

> **(C)** Any agreement or arrangement for collateral for security for an agreement that is prohibited under subparagraph (A) is also prohibited and is void from its inception. [Emphasis added.]

25. To similar effect, 37 U.S.C. § 701(c) states that "[a]n enlisted member of the Army, Navy, Air Force, or Marine Corps may not assign his pay, and if he does so, the assignment is void." The section further provides that no retired veteran may "allot" more than six payments to any third person unless (a) the relevant allotment began before retirement and (b) the relevant branch of the service was appropriately advised in advance. 37 U.S.C. § 701(d).

26. For purposes of this Complaint, Sections 38 U.S.C. § 5301(a) and 37 U.S.C. § 701 are collectively referred to as the Federal Anti-Assignment Acts.

**B.    The Defendants' Scheme In Violation of the Federal Anti-Assignment Acts.**

27. The allegations in this Complaint are based on the direct personal knowledge of the Plaintiffs as well as the results of investigations into the misconduct of the Defendants by state and federal officials and other private litigants.

28. The Department of Securities Sales of the State of Arkansas and the Texas State Securities Board recently concluded that Mr. Gamber directs the operation of at least VFG, SoBell, and BAIC.[1] Indeed, on information and belief, Mr. Gamber is the mastermind behind the activities outlined in this Complaint. On information and belief, Mr. Gamber has a long history of legal and regulatory misconduct, including:

> a. On April 14, 2008, Mr. Gamber and the Arkansas Insurance Commission entered into a consent order placing his insurance license on probationary

---

[1] *See*, e.g., Exhibit A, pp. 10, 11 and 59.

status following multiple complaints about Gamber's false and misleading conduct in connection with his activities as an insurance salesperson, including alleged forged signatures on paperwork.

b.  The Arkansas Insurance Commissioner filed a Cease and Desist Order directing Mr. Gamber to cease all insurance-related activities in the state because of, among other things, repeated misrepresentations to insureds and alleged financial improprieties.  Mr. Gamber entered into a Consent Order on or about July 1, 2009 surrendering his insurance license and agreeing to pay a penalty in the amount of $25,000.

c.  At least eight different states have entered orders barring Mr. Gamber and his companies from the illegal sale of securities associated with the pension purchase scheme described herein.  Such orders were entered by the following states on the following dates: Arkansas (April 22, 2013, March 18, 2014 and June 23, 2014); Iowa (September 20, 2013); New Mexico (December 10, 2013); Pennsylvania (May 12, 2014); Florida (August 24, 2014); California (November 7, 2014); Texas (February 1, 2016); Mississippi (February 23, 2017).  *See* Exhibit A.

29.    Mr. Gamber and his co-conspirators conspicuously fail to disclose any of the facts recited in Paragraph 30 to the veterans whom they solicit in connection with the pension purchase scheme.

30.    Mr. Corbett is believed to direct the operation of Bradling Financial Group, Veterans Benefit Leverage, and Performance Arbitrage Company.

31.    Performance Arbitrage Company and Strategic Marketing Innovators, while not named as defendants in this First Amended Complaint, are believed to be an active co-conspirator with the defendants in their nationwide scheme of depriving veterans of their federally protected pensions

32.    Ms. Kern-Fuller and Upstate Law Group have used their firm's IOLTA account as the conduit through which the other Defendants channel their monies in connection with the schemes described below.  Without limiting the generality of the foregoing, the investors have made  their lump sum deposits into this IOLTA account and, under the direction of Ms. Kern-Fuller and Upstate Law Group, the funds were then dispersed to the veterans and to one or more of the Defendants.  Ms. Kern-Fuller and Upstate Law Group also have received the veterans' monthly payments directly from the Veterans Administration, and sent each veteran the remainder of the benefit payment, after deducting the veteran's loan repayment amount.

33.    Collectively, the Defendants maintain a network of web sites designed to attract financially desperate veterans seeking a source of ready cash.  The Defendants promise veterans that they will receive an up-front lump sum distribution in exchange for the veterans' agreement to sell to an investor (i) a certain number and dollar amount of the veteran's military pension or benefits plus (ii) various fees, such as insurance fees to secure the payments in the event the veteran dies before the repayments are made in full.

34.    Attached as Exhibit D is a true and correct copy of the so-called New Seller Information Packet that has been utilized by BAIC.  On information and belief, that Seller's Kit, in substantially similar form, has been used consistently by the Defendants (including Voyager and VFG).   On information and belief, Mr. Gamber personally directs and controls the

operations of BAIC and directed and approved, for example, both (i) the creation and distribution

of the New Seller Information Kit and (ii) the transactions that are the subject of this lawsuit.

35.    In addition to filling out the New Seller Information Packet, each veteran also

executed a Sales Assistance Agreement with the Defendants. *See* Exhibit E. In the Sales

Assistance Agreement, BAIC commits that it will "assist" the veteran in finding a third-party

investor who will "buy" a stream of the veteran's benefits. *Id.* In part, it states:

> Seller appoint [sic] BAIC as Seller's agent for the express, limited,
> purpose of submitting a contingent offer for sale of the Payments
> ("Offer of Sale"), on Seller's behalf and under specified terms
> approved by the Seller, to one or more third party potential
> buyer(s), the identities of which are to be provided to BAIC by
> independent contractor(s); provided, however, that BAIC shall not
> provide Seller with any form of legal or financial advice at any
> time, and further provided that such agency relationship shall
> immediately terminate upon the closing of a sale of the payments,
> unless otherwise terminated as provided for herein.

36.    The Sales Assistance Agreement notes, for example, that in this instance, Mark

Corbett is the "Vendor" or "Independent Contractor" who will locate the specific investor to buy

the veteran's benefits or pension.  *See* Exhibit E, p. 1.

37.    At a now-defunct website (www.lumpsumsettlementstore.com), Voyager made

the following representations that explained how it (and its co-conspirator Defendants) have

operated:

> The Lump Sum Settlement Store is part of the Voyager Financial
> Group family.
>
> Through our money purchase pension plan, Lump Sum Settlement
> Store transacts a pension buyout and advances you the cash when
> needed.
>
> Nowhere else can you leverage your military, civil service or
> corporate pension by exchanging a future trickle of income for
> cold, hard cash in your hands today.

> The process is simple, easy and transparent. …  To let us know a little more about your pension, your needs, and your wants, we will contact you to discuss what we can do for you, and we will work with you to arrive in a quote that meets your needs.  After that, we'll send you the paperwork and ask you to return it so that we may begin working on your behalf!
>
> We will then work to find a buyer for your income stream.  Once we find a buyer, they will wire their money for the purchase to our escrow company.  The escrow company will then send your money to you.  The whole process can take as little as three to six weeks, from your returned paperwork to cash in your hands.
>
> During the pension period, you'll be required to carry a life insurance policy as collateral.  If you don't yet have life insurance, we have licensed independent agents ready to assist you in securing coverage.
>
> So, how much will you be paid for your pension?  The short answer is "it depends." Each time the Lump Sum Settlement Store staff evaluates a pension, we use a purely mathematical formula to help us define the present value of your future dollars.
>
> We purchase Civil Service, Corporate, and Military Pensions.

38.     After the veteran signs the Sales Assistance agreement, Mark Corbett (or some other, currently unknown "independent contractors") searches for persons who would be willing to buy the stream of the veteran's pension income.   These persons are hereafter called the "Purchasers."

39.     After finding a Purchaser, BAIC (or one of the other nationwide network of entities used by the Defendants such as VFG) instructs the veteran to enter into an agreement with the Purchaser.   Their escrow agent – Ms. Kern-Fuller and Upstate Law Group – then receives a lump sum from the Purchaser and remits a portion of that sum to the veteran after deducting life-insurance premiums, commissions, and other fees from the lump sum.

40.     None of the documents or other disclosures made by the Defendants discloses that these transactions are prohibited and void under the Federal Anti-Assignment Acts, nor do they reveal the multiple lawsuits and regulatory actions taken against the Defendants.  To the contrary, in the rare instances when a veteran inquires about this issue, the Defendants – including Ms. Kern-Fuller – represent that they have structured the transactions in such a fashion that the practice of buying a portion of the veterans' pension is legal.

41.     In approximately 18 months between 2011 and 2012 alone, Mr. Gamber and his affiliated entities have entered into illegal and unenforceable agreements of this kind with over three hundred veterans, affecting over $34.2 million in benefits.  *See* Exhibit A, p. 7.

42.     The Defendants' activity is widespread and, indeed, nationwide.  On November 8, 2011, the Wall Street Journal reported the following:

> Voyager officials helped set up web sites that bring it leads. . . . The company regularly updates a spreadsheet that details about available pension deals.  The spreadsheet that circulated in October included deals with a total of $8.2 million in future income.  Of the 93 pensions for sale . . . [f]orty four military veterans were on the list.

43.     The Defendants involved in these schemes extract substantial "commissions" – approximately 40% of the sum deposited by the Purchasers – in connection with these transactions without disclosing this fact to either the Purchaser buying the military pension or benefits or the veteran selling his or her military pension or benefit.

44.     The Defendants have conspired with, and acted in concert with each other, to identify and solicit pension sales from veterans that they know or should know are prohibited and void under the Federal Anti-Assignment Acts.

**C.     The Role of Candy Kern-Fuller and Upstate Law Group**

-15-

45.    With such vast streams of cash flowing in from military pensioners and the Purchasers, the Defendants needed a bank account to accept the ongoing deposits and make distributions to the Purchasers and the other Defendants.  The Defendants thus have utilized an IOLTA account maintained by Ms. Kern-Fuller and Upstate Law Group as the conduit through which the Purchasers' deposits and the veterans' deposits flow.

46.    Prior to closing a pension transaction with the Defendants, veterans must prove that they have instructed the Veterans Administration to deposit the veteran's entire monthly benefit directly into Upstate Law Group's IOLTA account.  The VA would likely refuse those instructions, so BAIC tells veterans to make the change online rather than over the phone, and to indicate that the IOLTA account is a "checking" account, since the VA will only allow deposits into checking or savings accounts. *See* Exhibit F.

47.    Purchasers wire their investment funds – usually $40,000-$50,000 – to Upstate Law Group's IOLTA account.

48.    Ms. Kern-Fuller and Upstate Law Group deduct approximately 40-50% from the Purchaser's investment funds for the Defendants' ostensible commission.  On information and belief, Ms. Kern-Fuller and Upstate Law Group wire the "commission" proceeds to the other Defendants. Ms. Kern-Fuller and Upstate Law Group then deduct substantial fees from the remainder, before wiring the balance to the veteran and/or the veteran's pre-existing creditors.

49.    Each month, after Ms. Kern-Fuller and Upstate Law Group receive the veteran's entire benefit directly from  the VA, they refund to the veteran (by electronic transfer) any amount that exceeds the veteran's monthly loan payment.  This means that veterans do not receive any portion of their monthly benefit until the middle of each month.

-16-

50.     Ms. Kern-Fuller and Upstate Law Group transmit the veteran's monthly loan payments to the Purchasers by wire transfer.

51.     Among other things, the use of the IOLTA account maintained by the law firm (a) fosters a deceptive illusion of legality and (b) permits the Defendants to monitor whether the veterans are making the requisite payments.

52.     In addition to making the Upstate IOLTA account available as the bank account for this pension scheme, Ms. Kern-Fuller and Upstate (a) purport to assist veterans in obtaining identity and financial verification documents; (b) facilitate the execution of the contracts; (c) sue allegedly defaulting veterans in an effort to enforce the agreements; and (d) oppose attempts to discharge such debt through bankruptcy.  In fact, VFG has offered the services of Upstate Law Group in at least one instance to assist a Purchaser in pursuing claims against a veteran.  *See* Exhibit A, p. 5.

53.     No matter how the Defendants may choose to style the transactions at issue, the effect is the same:  they are sales or assignments of a military pension or benefit of the kind prohibited by the Federal Anti-Assignment Acts.  As such, the agreements with the veterans are void and unenforceable from inception under the Federal Anti-Assignment Acts.

**E.**     **Additional Overreaching and Unconscionable Aspects of the Agreements**

54.     In addition to violating the Federal Anti-Assignment Acts, the Defendants use unconscionable agreements in an effort to deny veterans their legal rights.  Because these agreements are void "from inception," none of those objectionable features are legally enforceable.  Even independently of the application of federal law, the agreements are still unconscionable and unenforceable insofar as they:

a. Fail to disclose the applicable interest rate or finance charge associated with the so-called "sale." For example, the undisclosed interest rates on BAIC transactions in July 2013 are believed to have ranged between 25% and 47.18%.

b. Purport to strip any ruling by this or any other court any court regarding the illegality of these contracts as having any precedential effect. Exhibit G, for example, is a form agreement used by the Defendants in connection with the sale of a veteran's pension to a Purchaser. Section 19 declares, "[N]o verdict will have any preclusive effect as to issues or claims in any dispute with anyone who is not a named party to this contract."

c. Purport to impose a penalty – *in addition to other damages* – on any veteran who ultimately declines to continue to send his or her pension and benefits to the Upstate Law Group IOLTA account, in an amount equal to "DOUBLE THE INCOME STREAM PAYMENT FOR EACH INCOME STREAM PAYMENT THAT SELLER MISDIRECTS OR PREVENTS BUYER FROM RECEIVING." Exhibit G, Section 12 (capitalized in original).

d. Release the so-called "Transaction Team" (*i.e.,* BAIC, Corbett and Upstate Law Group) from any and all liability in consideration of their ostensibly "valuable services" in bringing the veterans and Purchasers together. *See* Exhibit G, paragraphs 11 and 20. Once again, the unconscionable intent of this clause is to, for example, have financially

desperate veterans release the Defendants for their complicity in conduct that has been found to be illegal by at least eight states.

e. In or about May 2017, at the same time that they changed bank accounts, Ms. Kern-Fuller and Upstate Law Group presented veterans with the option to sign an ACH Authorization Agreement in lieu of using the Upstate Law Group account. See Exhibit H.  Under this agreement, the veteran would have the VA deposit his or her monthly benefit directly into the veteran's own bank account, and Upstate Law Group would be authorized to make withdrawals in any amount it chose from the account. More specifically, the ACH Authorization Agreement (a) purports to authorize any debit by Upstate Law Group, including the debit of the full remaining balance due under the contract – plus liquidated damages equal to the amount of that balance – in the event of default; and (b) states that such recourse "is a fundamental condition and additional consideration to induce [the Purchaser] to enter into the Contract" with the veteran, despite the fact that the contract has already been formed, and thus no inducement is necessary or possible.

55.     All of the contractual obligations set forth in Paragraph 55 of this Complaint are void from inception.

## IV.
### The Operation of Defendants' Scheme As Applied to the Plaintiffs.

A.     **After an Honorable Discharge, Mr. Lyons
       Struggled to Meet His Financial Obligations to His Family.**

-19-

56.    Mr. Lyons is an honorably discharged member of the Marine Corps.  He served his country from November 1992 until June 2002, when he was discharged due to injuries he suffered during his service. His rank at the time of his discharge was Staff Sergeant.  Mr. Lyons continues to serve his country as a recruiter for the Office of Naval Intelligence. Mr. Lyons receives 90% military disability.

57.    Unfortunately, Mr. Lyons encountered a series of economically challenging events in 2013. These included a divorce, with alimony and child-support obligations, college expenses for his eldest daughter, and medical expenses for his family.  Because of these extensive financial responsibilities, Mr. Lyons incurred significant debt and was having difficulties in making ends meet.

58.    Mr. Lyons reached out through "www.buyyourpension.com," and was contacted by Mark Corbett.  Mr. Corbett provided forms and instructions to Mr. Lyons.  *See* Exhibit I.  .

59.    Mr. Lyons executed a standardized Sale Assistance Agreement with BAIC, a true and correct copy of which is attached as Exhibit E.

60.    The effective rate of interest paid by Mr. Lyons was 42.85%.  There were no disclosures of that fact in any materials provided to him.

61.    At no time did Mark Corbett, Andrew Gamber, BAIC (or any other defendant) tell Mr. Lyons that the transaction into which he was entering was prohibited and void under the Federal Anti-Assignment Acts.  Nor did they disclose the effective interest rate he would be paying.  After learning of the Federal Anti-Assignment Acts, and in fear that the agreement between him, BAIC, and the investor would place his veteran benefits at risk, Mr. Lyons ceased depositing his benefits check into the IOLTA account operated by Ms. Kern-Fuller and Upstate Law Group in October 2016.

-20-

**B.    After an Honorable Discharge, Mr. Wright's**
**Family Nearly Became Homeless.**

62.    Mr. Wright is the son of a military family, and proudly served in the United States Army from 1989 to 1994.  At the time of his discharge, his rank was Specialist E4.

63.    Mr. Wright was injured during a parachute training jump on a rainy night.  Strong crosswinds and poor visibility prevented Mr. Wright from seeing the ground and preparing his landing.  Mr. Wright injured his spine, resulting in bulging and herniated discs. He has since had one entire disc and parts of two others removed.  Mr. Wright receives 40% military disability.

64.    Even though Mr. Wright and his wife worked several jobs, they and their four young daughters were facing homelessness in 2013.  Mr. Wright had been homeless before, and could not let his family experience that trauma.  He began looking for options, and found BAIC.

65.    In early 2014, Mr. Wright executed a standardized Contract for Sale of Payments, substantially similar to the document attached as Exhibit J.  As a condition of entering into this contract, the Defendants forced Mr. Wright to use most of the funds to pay off his existing creditors.  Mr. Wright is a victim of identity theft, and is still unsure whether all of those alleged debts were even his.  Ultimately, Mr. Wright only received approximately $8,000 with which to achieve his original goal of supporting his family.

66.    At no time did BAIC (or any other defendant) tell Mr. Wright that the transaction into which he was entering was prohibited and void under the Federal Anti-Assignment Acts.

67.    On information and belief, the effective rate of interest paid by Mr. Wright exceeded legal limits, and up to half of the money paid by the Purchaser of Mr. Wright's

pension never reached Mr. Wright, but instead was appropriated by the Defendants herein. Those facts were not ever disclosed to Mr. Wright.

68.     In or about June 2016, after learning of the Federal Anti-Assignment Acts, and because of mounting medical expenses, Mr. Wright stopped the VA from sending any more of his disability benefit payments to the IOLTA account operated by Ms. Kern-Fuller and Upstate Law Group.

**C.     After an Honorable Discharge, Mr. Russo
        Had Trouble Staying on His Feet Financially.**

69.     As a Sergeant First Class in the United States Army, Adrian Russo was injured several times, including when his parachute collapsed during training, and when he fell through a roof while serving in Iraq.

70.     Mr. Russo is now a medically retired combat veteran who owns a small business and has a young family.  However, he had difficulty with the transition to civilian life, and needed a loan to ensure that the transition was a successful one.

71.     After finding out about BAIC online, Mr. Russo spoke to Mark Corbett and then Kaylee Campbell.  Mr. Russo subsequently executed a standardized Contract for Sale of Payments, a true and correct copy of which is attached as Exhibit K.

72.     At no time did BAIC (or any other defendant) tell Mr. Russo that the transaction into which he was entering was prohibited and void under the Federal Anti-Assignment Acts.

73.     The effective rate of interest paid by Mr. Russo is 31.05%.  Up to half of the money paid by the investor never reached Mr. Russo, but instead was appropriated by the Defendants herein.  Those facts were never disclosed to Mr. Russo.

74.     With the possible exception of payments that were misdirected due to a recent change in the IOLTA account maintained by the Upstate Law Group, Mr. Russo has made every payment due on his BAIC loan, and continues to make payments in a timely manner.

## COUNT I

### VIOLATION
### OF THE FEDERAL ANTI-ASSIGNMENT ACTS
### (By All Plaintiffs Against All Defendants)

75.     The Plaintiffs re-allege Paragraphs 1 through 74 as if set forth verbatim herein

76.     The Plaintiffs seek a declaratory judgment in accordance with 28 U.S.C. § 2201 and Federal Rule of Civil Procedure 57.

77.     The Federal Anti-Assignment Acts proclaim that any agreement that purports to assign a veteran's pension or benefits is void from inception.

78.     Perhaps in anticipation of attempts to circumvent the Federal Anti-Assignment Acts, 15 U.S.C. § 5301(a)(3)(A) specifies that "in *any* case" where a "person acquires for consideration the right to receive [a veteran's] benefit … such agreement *shall be deemed* to be an assignment and is prohibited."  Emphasis added.

79.     The Defendants' conduct as described herein violates the Federal Anti-Assignment Acts.  The agreements that the Plaintiffs are induced to sign assigning or selling some or all of their military pensions or benefits are prohibited and void from inception.

80.     Without limiting the generality of the allegations of Paragraph 80, the invalidity of the agreements executed by Plaintiffs means that the following provisions (and their substantively similar provisions in other agreements used by entities like VFG) are void and legally unenforceable:

a.  The obligation to pay a "liquidated damages" penalty equal to 100% of any unremitted funds in the event of a default or other failure to remit funds in satisfaction of the Sales Agreement;

b.  The recital that any adverse decision by this (or any other Court) shall not have collateral estoppels or res judicata effect.

## COUNT II

## VIOLATION
## OF THE RACKETEER INFLUENCED CORRUPT ORGANIZATIONS ACT

### (By All Plaintiffs Against Defendants Gamber, Corbett And Kern-Fuller)

81.   Plaintiffs re-allege paragraphs 1 through 74 as if set forth verbatim herein.

82.   Plaintiffs bring this cause of action against Messrs. Gamber, Corbett and Ms. Kern-Fuller for conspiring, agreeing, and confederating to violate, and for violating, 18 U.S.C. 1961(c), which makes it illegal for persons employed by or associated with an enterprise engaged in the activities of interstate commerce to conduct and participate, directly or indirectly, in the affairs of said enterprise through a pattern of racketeering.   Among other things, the Defendants acknowledge their coordinated activity as a "team" in an attestation they require to be signed by any veteran as a precondition to issuing funds to the veteran:

> *The Transaction Assistance Team (i.e., BAIC, Inc., their attorneys. Vendors, and/or agents)* will withhold an amount equal to one monthly from the lump sum purchase price to ensure that that your annuity provider successfully and timely changes your payment information and keep you out of default of your sales agreement. This money will be held by the Escrow Company [*i.e.,* Upstate Law Group] to ensure proper deposit of income stream payments. . . . [*See* Exhibit D, p. 13; emphasis added]

-24-

83.     As noted above, the Defendants have created an elaborate artifice – using multiple corporate entities and websites – to unlawfully induce veterans to assign their pensions or benefits.  Mr. Gamber controlled or controls multiple entities, such as BAIC, VFG, and SoBell that operate in conjunction with Ms. Kern-Fuller and Mr. Corbett and his corporate counterparts (such as Bradling Financial Group, Veterans Benefit Leverage, Performance Arbitrage Company) in furtherance of that unlawful purpose.  The combination of these Defendants is an enterprise as defined under 18 U.S.C. § 1961(4).

84.     On information and belief, Mr. Gamber, in consultation with Mr. Corbett and Ms. Kern-Fuller, directs the overall operation of the Defendants and sets, for example, the standard terms and conditions used in connection with the transactions, the "commissions" that are paid to the "independent agents" who find Purchasers, and the misleading and deceptive disclosures made to veterans.

85.     At all times relevant to this action, Messrs. Gamber and Corbett and Ms. Kern-Fuller conspired and agreed to conduct the affairs of the enterprise and did conduct the affairs of the enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c), (d).

86.     At all times relevant to this action, Mr. Corbett conducted the affairs of the enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c), (d).

87.     At all times relevant to this action, Mr. Gamber conducted the affairs of the enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c), (d).

88.     At all times relevant to this action, Ms. Kern Fuller conducted the affairs of the enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c), (d).

89.    Under 18 U.S.C. § 1961(1), "racketeering activity" includes any act indictable under 18 U.S.C. § 1343 (wire fraud) or 18 U.S.C. § 1341 (mail fraud).  The Defendants voluntarily and intentionally devised or participated in a scheme to defraud others out of money.  The Defendants did so with the intent to defraud.  It was reasonably foreseeable that interstate wire or mail communications would be used in furtherance of their fraudulent activities and,  in fact, interstate mail wire communications were used in furtherance of their fraudulent activities.

90.    In furtherance of the conspiracy to violate 18 U.S.C. § 1962 (c), Messrs. Corbett and Gamber and Ms. Kern-Fuller caused to be transmitted in interstate commerce materially incomplete disclosure documents and induced veterans to enter into agreements that are void and unenforceable under federal law, all in violation of the Federal Anti-Assignment Acts, 18 U.S.C. § 1343 (wire fraud), 18 U.S.C. § 1341 (mail fraud), 18 U.S.C. § 2 (aiding and abetting wire fraud), 18 U.S.C. § 1962 (c) (RICO) and 18 U.S.C. § 1962 (d) (RICO Conspiracy).

91.    The Defendants have engaged in "a pattern of racketeering activity" by committing or aiding and abetting in the commission of at least two acts of racketeering activity (*i.e.,* at least wire fraud and mail fraud) within the last 10 years within the meaning of 18 U.S.C. §1961(5).

92.    The purpose of the enterprise is to enrich the Defendants by inducing or defrauding veterans – often of limited means and poor credit – into entering into agreements that are unlawful and overreaching.  But for their persistent scheme to violate the Federal Anti-Assignment Acts, the Defendants would receive none of the lucrative commissions and profits they exact at the ultimate cost of financially desperate United States veterans.

93.    The Plaintiffs have been injured in their business or property by reason of this violation of 18 U.S.C. § 1962, in that as a direct and proximate result of the complained-of acts,

the Plaintiffs have suffered damages including, but not limited to, the payment of exorbitant and unconscionable fees in connection with these legally prohibited transactions.

94.    The Defendants reap millions of dollars annually through this fraudulent scheme, typically at the expense of desperate veterans who face financial challenges.

95.    Plaintiffs seek damages, declaratory judgment and injunctive relief as appropriate.

### COUNT III
### CIVIL CONSPIRACY
### (By All Plaintiffs Against All Defendants)

96.    The Plaintiffs re-allege Paragraphs 1 through 74 as if set forth verbatim herein.

97.    The Defendants are engaged in a civil conspiracy to deprive veterans of their pensions and benefits in violation of the Federal Anti-Assignment Acts.

98.    By their own admission in their various marketing documents and agreements, the Defendants have created and styled themselves as "partners" or as part of a "team."  Their activities reflect the joint assent of two or more parties in furtherance of an unlawful enterprise. Mr. Gamber (and his entities), Mr. Corbett (and his entities) and Ms. Kern-Fuller (and her firm) all have conspired in an effort to exact unconscionable profits through the unlawful purchase of the Plaintiffs' pensions and benefits.

99.    The primary purpose or object of the combination is to injure the plaintiffs (and other) as they seek to avoid the application of the Federal Anti-Assignment Acts.  They do this by engaging in ongoing misrepresentations concerning the nature of the underlying transactions.

100.    The activities of the Defendants in furtherance of the civil conspiracy have injured the Plaintiffs by subjecting them to unconscionable fees and by collecting and distributing sums

from the veterans in a fashion prohibited by Federal law.  In addition, the acts of the defendants in furtherance of the conspiracy caused the plaintiffs to suffer special damages, including but not limited to financial distress (including the economic losses incurred – directly and indirectly -- by virtue of having to pay extortionately high, but undisclosed, rates of imputed interest), emotional distress and mental anguish.  Moreover, while the Federal Ant-Assignment laws renders the agreement at issue here void from inception, there is no express provision in that law permitting veterans to recover, for example, special or punitive damages.  Plaintiffs do not seek double recovery.

101.    Plaintiffs seek damages, declaratory and injunctive relief as appropriate.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs seek judgment against Defendants, as follows:

a.      For an Order declaring that Defendants' conduct violates 38 U.S.C. § 5301 and 37 U.S.C. § 701;

b.      For an Order permanently enjoining all the Defendants (and all persons acting in privity with them, in whatever existing or subsequent corporate form) from engaging in any further actions in violation of 38 U.S.C. § 5301 and 37 U.S.C. § 701;

c.      For an Order granting each plaintiff damages in an amount equal to no less than the sums paid to the Defendants, plus pre and post judgment interest and fees;

d.      For an Order granting each plaintiff special damages in an amount to be proven at trial;

e.      For an Order granting Plaintiffs an award of reasonable attorney fees.

f.      For such other injunctive and declaratory relief as the Court may deem proper.

**JURY TRIAL DEMANDED**

The Plaintiffs hereby demand a trial by jury on all claims so triable.

Respectfully submitted on this 28th day of September, 2017.

By: s/ Stephanie E. Lewis
Stephanie E. Lewis (Fed. I.D. No. 09511)
lewiss@jacksonlewis.com
JACKSON LEWIS P.C.
15 South Main Street, Suite 700
Greenville, South Carolina 29601
(864) 232-7000

William F. Dolan, Esq. (*Pro Hac Vice to be Submitted*)
wdolan@jonesday.com
Jones Day
77 West Wacker
Chicago, IL 60601-1692
(312) 269-4362

Anne Richardson, Esq. (*Pro Hac Vice to be Submitted*)
arichardson@publiccounsel.org
Adelaide Anderson, Esq. (*Pro Hac Vice to be Submitted*)
Public Counsel
610 S. Ardmore Drive
Los Angeles, CA 90005
(231) 385-2977

*ATTORNEYS FOR PLAINTIFFS*

NAI-1503081244v1

-29-